**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SHEILA VALLIAN, | § | |
| on behalf of K.E.S., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-10-1739 |
| | § | |
| MICHAEL ASTRUE, Commissioner of the | § | |
| Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by Judge Lee H. Rosenthal, for full pretrial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Sheila Vallian ("Plaintiff," "Vallian"), on behalf of her minor daughter, K.E.S., and by Defendant Michael Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment and Memorandum in Support ["Plaintiff's Motion"], Docket Entry #16; Defendant's Motion for Summary Judgment and Brief in Support ["Defendant's Motion"], Docket Entries #10, #11). Each party has responded to the other's motion. (Plaintiff's Response to Defendant's Motion ["Plaintiff's Response"], Docket Entry #17; Defendant's Reply Brief ["Defendant's Response"], Docket Entry #18). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Defendant's motion be GRANTED, and that Plaintiff's motion be DENIED.

## Background

On November 14, 2007, Sheila Vallian filed an application for Supplemental Security Income ("SSI") benefits, under Title XVI of the of the Social Security Act ("the Act"), on behalf of her daughter, K.E.S.  (Administrative Transcript ["Tr."] at 76-78).  At that time, K.E.S. was twelve years old.  (*See* Tr. at 79).  In the application, Vallian claimed that her daughter became disabled on September 1, 2007, due to a learning disability.  (Tr. at 92-96).  On January 16, 2008, the Commissioner denied the application, finding that K.E.S. was not disabled under the Act.  (Tr. at 24).  Plaintiff petitioned for a reconsideration of that decision, but the SSA again denied her benefits, on April 9, 2008.  (Tr. at 25).

On April 18, 2008, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 29, 54).  That hearing, before ALJ Gary J. Suttles, took place on February 5, 2009.  (Tr. at 9-23).  Plaintiff appeared with her attorney, Donald Dewberry ("Dewberry"), and her daughter, K.E.S. (Tr. at 9, 23).  The ALJ listened to an opening statement from Dewberry, and then heard testimony from K.E.S.  (Tr. at 13-22 ).  Vallian did not testify at the hearing.

Following the hearing, the ALJ engaged in the following three-step, sequential analysis to determine whether K.E.S. was disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of medical findings.  20 C.F.R. § 416.924(b)**.**

2.  An individual who does not have a "severe" impairment will not be found to be disabled.  20 C.F.R. § 416.924(c).

3.  An individual who has a "severe impairment" that "meets, medically equals, or functionally equals" the listings is considered disabled. If not, the individual is not disabled.  20 C.F.R. § 416.924(d).

At the third step of the analysis, the ALJ must evaluate how the child is functioning within the

following six domains: (1) "acquiring and using information"; (2) "attending and completing tasks"; (3) "interacting and relating with others"; (4) "moving about and manipulating objects"; (5) "caring for [one]self"; and (6) "health and physical well-being."   20 C.F.R. § 416.926a(b)(1).   An impairment is considered to be "functionally equal[]" to the severity level of a Listing if her impairment results in "marked" limitations in two of these domains, or in an "extreme" limitation in one of these domains.   *See id.* § 416.926a(a).   A "marked" limitation exists if the impairment "interferes seriously with the ability to initiate, sustain, or complete activities."   *Id.* at § 416.926a(e)(2).   A "serious" limitation is present if "the impairment limits only one activity or when the interactive and cumulative effects of the impairment limits several activities."   *Id.* at § 416.926a(c).   The regulations also provide, as follows:

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a marked limitation when you have a valid test score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

*Id.* at § 416.926a(e)(2).   An "extreme" limitation is one that is "more than marked," and that interferes "very seriously with the ability to initiate, sustain, or complete activities."   *Id.*   It is the "equivalent of functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean."   *Id.*

Based on these principles, as well as his review of the evidence, the ALJ determined that K.E.S. suffers from a learning disability, and that her impairment is "severe."   (Tr. at 32).   He concluded, however, that K.E.S. "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   (*Id.*).   The ALJ also determined that K.E.S. did not have an impairment that "functionally

equals" one of the listed impairments.  (*Id.*).  Next, the ALJ found that K.E.S. had a "marked" limitation in "acquiring and using information," citing academic records which showed that "her difficulties with oral and written language comprehension and expression limit her performance in a classroom setting." (Tr. at 35).  He also recognized, however, that her scores from the Woodcock-Johnson Tests of Cognitive Ability and the Cognitive Test of Non-Verbal Ability showed that K.E.S. had average cognitive ability.  (*Id.*).  In regard to "attending and completing tasks," the ALJ determined that K.E.S.'s limitation was not great enough to be defined as "marked," and termed it "less than marked." (Tr. at 36).  In support of that finding, he pointed out that her teachers' evaluations varied on K.E.S.'s ability to complete tasks.  (*Id.*).  He also cited an evaluation of K.E.S. by the Spring Branch Independent School District's Department of Special Education ("DSE"), titled "2005 Full Individual and Initial Evaluation," that did not reveal that the child had any difficulties in "attending and completing tasks."  (*Id.*).  In addition, the ALJ noted that, on a "Function Report," Vallian wrote that K.E.S. completed her homework by herself, and in a timely fashion.  (*Id.*).  The ALJ concluded, as well, that K.E.S. had a "less than marked" limitation in "interacting and relating with others," in "caring for yourself," and in "health and physical well-being."  (Tr. at 36-39).  He found that she was not limited in "moving about and manipulating objects."  (*Id.*).  As to "interacting and relating with others," the ALJ acknowledged that K.E.S. had trouble communicating in class and remembering information. (Tr. at 37).  However, he emphasized that the evaluations and reports in evidence showed K.E.S. to be "cooperative and friendly, and she responds well to both praise and correction."  (*Id.*).  In reference to "caring for yourself," the ALJ recognized that K.E.S.'s teachers rated her ability to initiate tasks independently at different levels, one at "below average," and the other at "average." (Tr. at 39).  He noted, however, that Vallian

4

claimed that K.E.S. was able to ask for things that she needed, that she could tell time, and that she could make change.  (*Id.*).  The ALJ further pointed to K.E.S.'s testimony that she rides the bus to school as evidence that she is not as limited as her mother alleges.  (*Id.*).  Ultimately, the ALJ concluded that K.E.S. had a "marked" limitation in one domain only, and so she was not "disabled" as defined in the Social Security Act.  (Tr. at 40).

On February 18, 2009, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 1).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470.  On March 30, 2010, the Appeals Council denied the request for review, finding that Plaintiff's arguments did not provide a basis to reconsider the ALJ's decision.  (Tr. at 1-5).  With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On May 11, 2010, Plaintiff filed this lawsuit, on her daughter's behalf, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the decision to deny her SSI benefits.  (Docket Entry #1).  Subsequently, the parties filed cross-motions for summary judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Randall v. Astrue*, 570 F.3d 651, 655 (5th Cir. 2009); *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* "'Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support a conclusion.'" *Randall*, 570 F.3d at 662 (*quoting Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992)); *accord Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Randall*, 570 F.3d at 662; *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age. *See Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). If there are no credible evidentiary choices or medical findings that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

**Discussion**

Before this court, Plaintiff challenges the SSA's decision on two grounds. She argues first that the ALJ erred because his determination that K.E.S. has a "less than marked" limitation in the

domain of "attending and completing tasks" is not supported by substantial evidence.  (Plaintiff's Motion at 9).  In addition, she claims that the ALJ erred because he failed to properly develop the record on K.E.S.'s cognitive and functional ability.  (*Id.* at 17).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that K.E.S. is not disabled under the Act and is not entitled to an award of Social Security Income benefits.  (Defendant's Motion at 8-9).

### *Medical Facts, Opinions, and Diagnoses*

The administrative transcript includes no evidence that K.E.S. was ever treated for her learning disability by any physician or other medical expert.  The limited records available show that K.E.S. has maintained relatively good physical health.  (*See* Tr. at 129, 143-49, 251-83, 299-314, 318-21).  Her medical records are from routine appointments, documenting only minor ailments and injuries that are not relevant to this claim.  (*See id.*).  Other medical records show that K.E.S.'s vision is slightly impaired, but that she uses corrective glasses.  (Tr. at 251, 252).  Those same records show that K.E.S. had slightly impaired hearing at a younger age, but that it is no longer a problem.  (*Id.*).  The only other medical evidence reveals that K.E.S. has been prescribed medication for acne and for treatment of common allergies.  (Tr. at 129).  The significant evidence in the administrative transcript relates to K.E.S.'s learning disability, and consists of school progress reports, Texas standardized test scores, and psychological and functional evaluations performed by the Spring Branch Independent School District's Department of Special Education.  (*See* Tr. at 98-99, 109-10, 151, 191-94).

The earliest academic records show that K.E.S. exhibited signs of a learning disability in the first and second grades.  (Tr. at 191-94).  Both her first and her second grade teachers reported that

she displayed below average language skills.  (*Id.*).  Their reports noted K.E.S.'s difficulties in

"language expression" and retention.  (*Id*.).  In particular, K.E.S.'s second grade teacher, Natalie

Smith ("Smith"), rated her ability to "remember information just heard," to "express herself fluently

when called upon," and to "organize and relate ideas and factual information" as below average.

(Tr. at 191).  Ms. Smith rated K.E.S.'s ability to "use adequate grammar for general understanding"

as poor.  (*Id*.).  Both of K.E.S.'s first and second grade teachers filed "student referral forms" with

the Student/Teacher Assistance Team and the DSE.  (Tr. at 190, 192).  When K.E.S. was in second

grade, the school's vice-principal observed her during class, and reported to the DSE that she did

not speak in complete sentences, use good grammar, or complete tasks on time.  (Tr. at 218).

The next record, from June 9, 2005, shows that the DSE performed a Full Individual and

Initial Evaluation ("IIE") of K.E.S. at the request of the Student/Teacher Assistance Team.  (Tr. at

168-88).  At the time of the evaluation, K.E.S. was in the second grade.  (Tr. at 162).  The evaluation

consisted of a series of learning ability assessment tests: the Woodcock-Johnson Tests of Cognitive

Abilities-III ("WJC-III"),[1] the Woodcock-Johnson Tests of Achievement-III ("WJA-III"),[2] and the

Comprehensive Test of Nonverbal Intelligence ("C-TONI").[3]  (Tr. at 169).  Kathy Lucas ("Lucas"),

---

[1] The Woodcock-Johnson III Tests of Cognitive Abilities is a wide-range system for measuring general intellectual ability and specific cognitive skills. The WJ-III cognitive battery measures comprehensive-knowledge, long-term retrieval, visual-spatial thinking, auditory processing, fluid reasoning processing speed, and short-term memory. The test is designed to provide age-based or grade-based norm-referenced ability scores.  *See* NELSON EDUCATION, *http://www.assess.nelson.com/test-ind/wj-3.html* (last visited June 15, 2011).

[2] The Woodcock-Johnson III Tests of Achievement include twenty-two tests for measuring skills in reading, writing, and mathematics, as well as important oral language abilities and academic knowledge. The tests provide norm-based references for measuring academic ability. The tests provide information that can be used for identifying deficiencies in learning ability and developing instructional interventions.  *See* NELSON EDUCATION, *http://www. assess.nelson.com/test-ind/wj-3.html* (last visited June 15, 2011).

[3] The Comprehensive Test of Nonverbal Intelligence is a nonverbal cognitive measure of reasoning ability without the use of language. The test measures analogical reasoning, categorical classification, and sequential reasoning using six sub-tests in two different contexts:  pictorial and geometric.  *See* AMERICAN SPEECH-LANGUAGE-

the educational diagnostician for the DSE, administered the tests.  (*Id.*).

On the WJA-III, K.E.S. scored in the second and fourth percentile in oral language and listening comprehension, respectively.  (*Id.*).  Her reading comprehension score was in the fourth percentile.  (Tr. at 176).  Each of these scores was greater than one standard deviation below K.E.S.'s indicated potential.  (Tr. at 169).  K.E.S.'s scores in the areas of oral expression and listening comprehension indicated that her verbal abilities were below average, and that her overall mental ability suffered as a result.  (Tr. at 170).  In particular, the test results showed that K.E.S. struggled to recall the details of stories, and to follow instructions of increasing length and complexity.  (*Id.*).  Lucas determined that K.E.S. would be less successful than her peers in language and reading comprehension activities.  (Tr. at 176).  The emotional and behavioral component of the WJA's, however, showed that K.E.S. was "average" or "above average" in every category of classroom behavior.  (Tr. at 171).  Moreover, the physical component of the test shows K.E.S.'s general and fine motor skills within the normal range for her age group.  (*Id.*).

On the WJC-III, K.E.S. scored below the tenth percentile in the categories of Verbal Comprehension, Visual-Auditory Learning, General Information, Overall Verbal Ability, and Comprehensive Knowledge.  (Tr. at 172).  She scored in the first percentile for General Information, Overall Verbal Ability, and Comprehension-Knowledge.  (*Id.*).  These scores indicate that K.E.S.'s General Intelligence Ability is in the below average range, and that her Verbal Ability is in the very low range.  (*Id.*).  However, her Thinking Ability and Cognitive Efficiency scores fell within the average range.  (*Id.*).  The tests further showed a large difference between her verbal and thinking ability scores.  (Tr. at 173).

_____

HEARING ASSOCIATION, *http://www.asha.org/ SLP/assessment/Comprehensive -Test-of-Nonverbal-Intelligence-(CTONI).html* (last visited June 15, 2011).

9

In response to this discrepancy, Lucas administered the C-TONI. (Tr. at 174). The C-TONI results showed that K.E.S.'s thinking ability is at an average level. (*Id.*). The evaluation also included an examination of K.E.S.'s academic history. (Tr. at 175, 250, 253). Her progress reports from first and second grade showed that she was passing all academic classes. (Tr. at 175). However, she was found to work below her grade level, and was scored accordingly. (*Id.*).

In response to the tests and the evaluation report submitted by Lucas, the DSE determined that K.E.S. had a learning disability. (Tr. at 177). In particular, the IIE reported that K.E.S. had a disorder that affected her ability to understand and use oral or written language. (*Id.*). No medical condition was identified that was related to the disorder. (Tr. at 178). Lucas reported that special education instruction and support services are necessary to help K.E.S. progress academically. (*Id.*). The IIE report identified specific weaknesses in the areas of reading, writing, and math, and noted that K.E.S. "may need reading assistance." (Tr. at 179-80). There were no weaknesses identified in the areas of behavior and development. (*Id.*). The report recommended that assignments and instructions be modified to improve K.E.S.'s weaknesses, and that she receive additional support when taking tests. (Tr. at 180-81). In addition, Lucas recommended that an Admission/ Review/Dismissal ("ARD") committee[4] be assigned to K.E.S., create an Individualized Educational Plan[5] ("IEP"), and perform regular reviews of her progress. (Tr. at 181).

---

[4] An Admission/Review/Denial committee serves as an assessment team for individual students that have been identified as having a learning disability by the school's district's special education department. The Special Education Department will establish a committee that generally consists of the identified student's parent(s), general education teacher(s), special education teacher(s), and a department representative. The committee is responsible for creating an Individual Education Plan and performing continual assessment of the student's progress to determine if more or less assistance is necessary. *See* Texas Education Agency, *A Guide to the Admission, Review, and Denial Process,* at 3 (June 2002), *available at http://ritter.tea.state.tx.us/special.ed/ardguide*.

[5] An Individual Education Plan is a written plan/program developed by a school's special education team with input from parents and it specifies the student's academic goals, the method to obtain those goals and other information relevant to the student's disability and academic performance. The Individuals with Disabilities

The administrative transcript also includes K.E.S.'s school progress reports from the third and fifth grades.  (Tr. at 248, 287).  The third grade report showed that, in all subjects, K.E.S.'s comprehension and application was "adequate" for her age.  (Tr. at 248).  The report from the fifth grade, which covered only the third nine-week period of the school year, showed that K.E.S.'s level of comprehension and application in reading and science was "inadequate."  (Tr. at 287).

The administrative transcript includes, as well, the results of K.E.S.'s Texas State Alternative Assessment Tests[6] ("TSAA") for the third and fourth grades.  (Tr. at 163-67).  On these tests, K.E.S. exceeded expectation levels for math, writing, and reading.  (*Id.*).  Other records show that K.E.S. met the Texas Essential Knowledge and Skills[7] ("TEKS") standard in math, but not in reading or writing, and that her Texas Assessment of Knowledge and Skills[8] ("TAKS") scores were above average in science and only slightly below average in reading skills.  (Tr. at 163-67, 315).

Another of K.E.S.'s school records shows that, on October 19, 2007, the ARD committee

---

Education Act requires a school to create and maintain an IEP for every child that is disabled under its criteria. Texas Education Agency, *A Guide to the Admission, Review, and Denial Process,* at 4 (June 2002), *available at http://ritter.tea.state.tx.us/special.ed/ardguide.*

[6] Alternative Assessment tests are modified versions of the standard Texas Assessment of Knowledge and Skills. The alternative assessments are given to students with learning disabilities as part of their special education assistance. The ARD decides what alternative assessment or modified test will take based on a review of that student's individual capabilities.  Texas Project FIRST: *Families, Information, Resources, Support & Training*, *http://www.texasprojectfirst.org/TAKS.html* (last visited June 15, 2011).

[7] Texas Essential Knowledge and Skills is the statewide curriculum established in 1998 by the Texas State Board of Education. The TEKS establishes student expectations levels for academic achievement in every grade for every school subject area. Texas measures student's progression  and current achievement levels using a statewide assessment test called the Texas Assessment of Knowledge and Skills, or TAKS.  Texas Project FIRST: *Families, Information, Resources, Support & Training, http://www.texasprojectfirst.org/TEKStCurKtoHS.html* (last visited June 15, 2011).

[8]The Texas Assessment of Knowledge and Skills is the statewide assessment test required  by the State in order to measure each student's current level of academic achievement for every grade and subject area as it relates to the expectation levels set by the Texas Essential Knowledge and Skills curriculum.  Texas Project FIRST: *Families, Information, Resources, Support & Training*, http://www.texasprojectfirst.org/TAKS.html (last visited June 15, 2011).

met for an annual review of her academic progress.  (Tr. at 152-62).  K.E.S. was in fifth grade when that meeting took place.  (*Id.*).  The district representative for DSE and K.E.S.'s special education instructors attended the meeting.  (Tr. at 162).  The committee noted that K.E.S.'s IEP indicated that she was slightly below average in math, and that she was reading at a third/fourth grade level.  (Tr. at 161).  The committee then created a Learner Accommodations and Modifications Profile[9] ("LAMP") to supplement K.E.S.'s instruction.  (Tr. at 155).  The committee decided that K.E.S. should receive three hours of outside resource instruction, per week, in math and in class support for language arts.  (Tr. at 151,161).

Two subsequent academic reports, dated December 10, 2007, and March 13, 2008, show that K.E.S. continued to perform below average when compared to other students.  (Tr. at 98-99, 109-10).  The December 2007 report, which was filed by K.E.S.'s special education teacher, Anne Dennis ("Dennis"), noted that K.E.S. was reading at a third or fourth grade level.  (Tr. at 98).  Dennis also rated K.E.S.'s ability to comprehend classroom discussions, to remember information just heard, to initiate activities independently, and to retain instructions from week to week was below average.  (Tr. at 99).  She further rated K.E.S.'s ability to exhibit organization in accomplishing tasks as average, and her ability to complete tasks on time as above average.  (*Id.*). A March 2008 report, which was filed by K.E.S.'s fifth grade teacher, Kerry Cashiola ("Cashiola"), and her diagnostic teacher, Sandy Kane ("Kane"), indicated that K.E.S.'s reading comprehension was below a fifth grade level, and that her math skills were slightly below a fifth grade level.  (Tr.

---

[9]A Learner Accommodations and Modifications Profile is a written record indicating the type of special education assistance a student should receive to supplement their general education.  Spring Branch Independent School District, *Secondary Grading and Reporting Guidelines,* at 3 (Fall 2006), *available at* http://authenticeducation.org/bigideas/cards/sec-grade-guide.pdf?-session=Auth:42F947E4032d304E31QYFF0CD498.

at 109).   The report rated her ability to remember information just heard, to express herself adequately, to retain instruction from week to week, and to exhibit organization in accomplishing tasks as below average.  (Tr. at 110).  Both Cashiola and Kane gave K.E.S. the lowest possible performance rating on her ability to complete tasks on time.  (*Id.*).

As part of her application for SSI, Vallian completed a questionnaire titled "Function Report —Child Age 6 To 12th Birthday."  (Tr. at 79-88).  On that report, dated November 16, 2007, Vallian responded, "Not Sure," to the question, "Is the child's ability to communicate limited?"  (Tr. at 79, 82).  Vallian reported that K.E.S. is unable to repeat stories that she has heard, to tell jokes or riddles accurately, or to explain why she did something.  (*Id.*).   However, Vallian also stated that her daughter could deliver telephone messages, and that she could talk with friends and family.  (*Id.*). Vallian responded, "Yes," to the question, "Is the child's ability to progress in learning limited?" (Tr. at 83).  She reported that K.E.S. is unable to use language to read and write effectively.  (*Id.*). But she also reported that K.E.S. could use basic math, and could tell time.  (*Id.*).   Vallian responded, "No," to questions on whether K.E.S.'s impairment affected her ability to perform physical tasks, to interact with others, or to take care of herself.  (Tr. at 84-86).  She responded, "Yes," to the question, "Is the child's ability to pay attention and stick with a task limited?"  (Tr. at 87).  Vallian stated that her daughter was unable to complete chores most of the time.  (*Id.*).   She also reported, however, that K.E.S. could keep busy on her own, that she finished things that she started, that she worked on arts and crafts projects, and that she completed her homework.  (*Id.*).

On January 11, 2008, Dr. Monica Fisher ("Dr. Fisher"), a pediatrician, performed an initial childhood disability evaluation on behalf of the state.  (Tr. at 255).  Dr. Fisher determined that K.E.S.'s learning disability was an impairment, and that it was severe.  (Tr. at 254).  She also

determined, however, that the learning disability did not meet, medically equal, or functionally equal

a listed impairment, because it did not cause a marked limitation in two of the five relevant domains.

(Tr. at 254, 256-57).  In her report, Dr. Fisher stated that K.E.S.'s impairment resulted in "less than

marked" limitations in two domains: "acquiring and using information"; and "attending and

completing tasks."  (Tr. at 256).  For the "acquiring and using information" domain, Dr. Fisher relied

on K.E.S.'s scores from the WJC-III, WJA-III, and the C-TONI tests.  (*Id.*).  In the "attending and

completing tasks" section, Dr. Fisher cited the ratings from the December 2007 school activity

report that was filed by Dennis.  (*Id.*).

On March 13, 2008, Vallian completed another questionnaire, titled "Function

Report—Child Age 12 To 18th Birthday."  (Tr. at 111).  Vallian responded, "No," to the question,

"Are the child's daily activities limited?"  (Tr. at 114).  She responded, "Yes," to the question, "Is

the child's ability to communicate limited?"  (*Id.*).  Vallian stated that K.E.S. was unable to deliver

phone messages accurately, but that she was able to use the telephone.  (*Id.*).  Vallian also reported

that K.E.S. was able to tell jokes and riddles accurately, to explain why she did something, to request

something that she needs, and to have conversations with family and friends.  (*Id.*).  Vallian

responded, "Yes," to the question, "Is there any limitation in the child's progress in understanding

and using what she has learned?"  (Tr. at 115).  She reported that K.E.S. was unable to read and to

understand sentences in comics and cartoons; to read and understand stories in books, magazines,

or newspapers; to spell words of more than four letters; and to understand, carry out, and remember

simple instructions.  (*Id.*).  In contrast, Vallian stated that K.E.S. was able to tell time; to add,

subtract, multiply, and divide numbers over ten; and to make change.  (*Id.*).  Vallian responded,

"No," to the question, "Does the child's impairment affect her social activities or behavior with other

14

people?" (Tr. at 116). She also stated, however, that K.E.S. does not have friends her own age, and seemed unable to make new friends. (*Id.*). For the question, "Is the child's ability to take care of his or her personal needs and safety limited?", Vallian responded, "No." (Tr. at 117). She elaborated, stating that her daughter was able to take care of personal hygiene, get to school on time, study and do homework, keep out of trouble, obey rules, avoid accidents, and ask for help when needed. (*Id.*). Vallian responded, "No," to the last question, "Is the child's ability to pay attention and stick with the task limited?" (Tr. at 118). But despite the "No" answer, she also reported that, most of the time, K.E.S. was unable to work arts and crafts projects, to finish things she starts, and to complete chores. (*Id.*). On the other hand, Vallian stated that K.E.S. was able to keep busy on her own and complete her homework on time. (*Id.*).

On April 1, 2008, K.E.S. underwent a psychological evaluation at Baylor College of Medicine. (Tr. at 291-92). The evaluation was conducted by Dr. Robert G. Harper ("Dr. Harper"), a psychiatrist. (*Id.*). Following the evaluation, Dr. Harper reported that the results were invalid because K.E.S. provided inconsistent responses to test questions, and exhibited unusual behavior. (Tr. at 292). Dr. Harper reported that, based on the performance tests he conducted, K.E.S.'s cognitive and mental functioning had declined since the evaluation conducted by the DSE in 2005. (*Id.*). However, Dr. Harper commented that he could not determine whether these results were a product of intentional behavior, or an indication of a learning disability. (*Id.*).

On April 7, 2008, Dr. John Ferguson ("Dr. Ferguson"), a psychologist, performed another childhood disability evaluation of K.E.S. (Tr. at 294). Dr. Ferguson stated that he agreed with Dr. Fisher that K.E.S. had a severe impairment that did not meet or functionally equal a listed impairment. (Tr. at 293). He reported that K.E.S.'s learning disability resulted in a "marked"

limitation only in the domain of "acquiring and using information." (Tr. at 295). In support of his findings, Dr. Ferguson cited K.E.S.'s grades for the previous year, her completion of the TAKS test, the ARD support she was receiving, and her Woodcock-Johnson tests scores. (*Id.*). Dr. Ferguson determined that K.E.S.'s disability resulted in a "less than marked" limitation in the domain of "attending and completing tasks." (*Id.*). For this conclusion, Dr. Ferguson referenced the March 2008, school activity report that rated K.E.S.'s ability to complete tasks on time as poor, and her ability to exhibit organization in accomplishing tasks as below average. (*Id.*).

### *Educational History, Background and Present Age*

At the time of the hearing, K.E.S. was thirteen years old, and in the sixth grade. (Tr. at 16). When she was younger, she repeated the first and second grades, and she attended summer school for some unspecified years. (Tr. at 14, 16, 21). The remainder of K.E.S.'s educational history is documented in her academic records and is detailed above. K.E.S. had no work history. (Tr. at 32).

### *Hearing Testimony*

At the hearing before the ALJ, K.E.S. testified that she rides the bus to school, and that she can perform the same physical activities as other children her age. (Tr. at 17-18). She also testified that she has friends, one from her neighborhood and two from her school, with whom she regularly interacts. (Tr. at 18-19). She also testified that she gets along well with all of her teachers, and with her older sister and younger brother. (Tr. at 17, 21). K.E.S. told the ALJ that she liked to talk to her friends, and to listen to rhythm and blues-style music. (Tr. at 20). K.E.S. also testified that she uses online social networking sites, including "Facebook" and "MySpace," to chat with other people. (Tr. at 20-21). She stated that she also uses the computer to watch videos. (*Id.*). K.E.S. testified that, at home, she is responsible for cleaning her room, cleaning the bathroom, and washing dishes.

(Tr. at 19).

K.E.S. told the ALJ that her favorite subject in school is math, but that she is not a fan of reading.  (Tr. at 17).  She testified that she also has two favorite teachers, a math teacher and a science teacher.  (Tr. at 18).  K.E.S. testified that she sometimes does her homework at school, and that other times she completes it at home.  (Tr. at 19).  She stated that, when she needs help, she will ask a teacher or her mother. (*Id.*).  When asked about her future plans, K.E.S. offered the following testimony:

> I want to finish school and I want to go to college.  I want to be a lawyer [or] a teacher.

(Tr. at 22).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he determined that K.E.S. suffers from a "learning disability," and that it is "severe." (Tr. at 32).  He found, however, that K.E.S. "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  (*Id.*).  In particular, the ALJ referenced K.E.S.'s scores on the WJC-III and the C-TONI tests, and concluded that her learning disability does not meet the criteria for Listing 112.05.[10]  (*Id.*).  The ALJ also determined that K.E.S. "does not have an impairment or combination of impairments that functionally equals the listings."  (*Id.*).  Next, the ALJ considered each of the relevant learning domains.  (Tr. at 34-40). He found that K.E.S. has a "marked limitation" in "acquiring and using information."  (Tr. at 35). In making that finding, he cited the reports from K.E.S.'s teachers, which show that "her difficulties

---

[10] "Mental retardation" is "[c]haracterized by significantly sub-average general intellectual functioning with deficits in adaptive functioning."  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 112.05.

with oral and written language comprehension and expression limit her performance in a classroom setting." (Tr. at 35). However, the ALJ also found that K.E.S. had a "less than marked limitation" in the domains of "acquiring and completing tasks," "interacting and relating with others," "the ability to care for herself," and "health and physical well-being." (Tr. at 36-39). He further found that K.E.S. was not limited in the domain of "moving about and manipulating objects." (Tr. at 37-38). The ALJ concluded that K.E.S. "has not been disabled, as defined in the Social Security Act," because her learning disability did not result "in either 'marked' limitations in two domains of functioning," or in an "'extreme' limitation in one domain of functioning." (Tr. at 40). That decision prompted Plaintiff's request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers v. Apfel*, 238 F.3d 617, 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id.* A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In her motion, Plaintiff focuses solely on the ALJ's determination that K.E.S. had a "less than marked limitation" in the domain of "attending and completing tasks." (Plaintiff's Motion at 17-26). That domain "considers how well a child is able to focus and maintain attention, and how well he/she is able to begin, carry through, and finish activities, including the pace at which he/she performs activities and the ease of changing activities." 20 C.F.R. § 416.926a(h). The regulations that govern the SSA provide an explanation on how the level of limitation is determined. *See id.*

18

§ 416.926a(f)(1).  That explanation is set out below:

> When we consider whether you have "marked" or "extreme" limitations in any domain, we examine all the information we have in your case record about how your functioning is limited because of your impairment(s), and we compare your functioning to the typical functioning of children your age who do not have impairments.

*Id*.  Plaintiff contends that, in this case, the "information in [the] case record" supports a determination that K.E.S. had a "marked" limitation in her ability to attend and complete tasks. (*Id.*).

In his written decision, the ALJ referred to the December 2007 and March 2008 school activity reports, the 2008 Function Report, and the 2005 IIE, in his findings regarding K.E.S.'s limitations under "attending and completing tasks" domain.  (Tr. at 36).  He noted, in part, the following facts:

> The claimant's special education teacher and her general education teachers have widely varying observations in this area, with one above "average" and the other "poor." The claimant's June 2005 Individual and Initial Evaluation did not describe any difficulties in this area, and a report from her 1st grade teacher showed that she was average in completing tasks. Also, the claimant's mother wrote in a March 2008 Function Report that the claimant completed her homework on time and by herself.

(*Id.*).  In his findings, the ALJ also observed that the December 2007 and March 2008 school activity reports present conflicting evidence on K.E.S.'s ability to attend to and to complete tasks.  (*Id.*).  Her teachers rated K.E.S.'s abilities in several areas that relate expressly to the ability to attend to and complete tasks.  (*See* Tr. at 99, 110; Plaintiff's Motion at 13-15; Defendant's Response at 2-3).  For instance, in the December 2007 report, Dennis, a special education teacher, rated K.E.S.'s ability to complete tasks on time as "above average," and her ability to "exhibit organization in accomplishing tasks" as "average."  (Tr. at 99).  But, in the March 2008 report, Cashiola and Kane, both general education teachers, rated K.E.S.'s ability as "poor" and "below average" in the same

19

respective categories.  (Tr. at 110).  On the other hand, Cashiola and Kane rated K.E.S.'s ability to initiate tasks independently as "average," while Dennis rated her as "below average" in that category.  (Tr. at 99, 110).  It should be noted that Dr. Fisher reviewed the December 2007 report when she performed the initial Childhood Disability Evaluation of K.E.S. on January 11, 2008, and that Dr. Ferguson reviewed the March 2008, report when he did a follow-up evaluation on April 7, 2008.  (Tr. at 256, 295).  In both cases, the doctors determined that K.E.S. had a "less than marked" limitation in the domain of "attending and completing tasks."  (*Id.*).  The ALJ found support for his decision in a combination of these records.  (Tr. at 35-36).

In his decision, the ALJ also cited the 2008 Function Report that Vallian completed.  (Tr. at 36).  In that report, Vallian stated that K.E.S. was unable to deliver telephone messages and to tell jokes and riddles accurately, but that she was able to use the telephone, to explain why she did something, to ask for what she needs, and to talk with friends and family.  (Tr. at 114).  Vallian stated that her daughter was unable to read and understand sentences in comics and cartoons; to read and understand stories in books, magazines, or newspapers; to spell words of more than four letters; and to understand, carry out, and remember simple instructions.  (Tr. at 115).  In clear contrast, however, Vallian reported in the same document that K.E.S. was able to tell time; to add, subtract, multiply, and divide numbers over ten; and to make change.  (*Id.*).  Further, Plaintiff stated that K.E.S. was unable to work arts and crafts projects, to finish things that she starts, and to complete chores most of the time, but then reported that her daughter was able to keep busy on her own and to complete her homework on time.  (*Id.*).  The ALJ put particular emphasis on Vallian's report that K.E.S. was able to complete her homework assignments, which is corroborated by the child's testimony.  (*See* Tr. at 19, 36).

In this case, the school activity reports and the Function Report support the finding that K.E.S.'s learning disability does not "seriously interfere" with her ability to complete tasks. (Tr. at 99, 100, 114-18). Dennis's report and the Function Report both show that K.E.S. is able to perform and complete tasks competently. (Tr. at 99, 114-18). Although the March 2008 report rated K.E.S.'s ability to complete tasks as "poor," it also rated her ability to initiate tasks independently as "average." (Tr. at 110). Likewise, although Vallian indicated that her daughter could not perform some tasks, she also answered, "No," to the question, "Is the child's ability to pay attention and stick with the task limited?" (Tr. at 118). Moreover, both Dr. Fisher and Dr. Ferguson determined that K.E.S.'s limitation in the domain of "attending and completing tasks" was "less than marked." (Tr. at 256, 295). These records, taken together, are sufficient evidence to support the ALJ's decision that K.E.S. had a "less than marked" limitation in the domain of "attending and completing tasks." *Ripley*, 67 F.3d at 555. For that reason, the ALJ's decision is supported by substantial evidence.

### Age-Appropriate Abilities

Nevertheless, Vallian argues that the regulations limit an ALJ's ability to consider the types of activity a child can do, and that the ALJ did not heed them. (Plaintiff's Motion at 14-16). She cites portions of the regulations that provide activities a child in specified age groups should be able to perform within each domain. (*Id*. [citing 20 C.F.R. § 416.926a(f)(3)]). For instance, within the domain of "attending and completing tasks," the regulations state that children who do not suffer from significant impairments and who are between the ages of 6 to 12 should be able to handle specific tasks, such as the following:

> focus his/her attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework

> assignments. The child should be able to concentrate on details and not make careless mistakes in his/her work (beyond what would be expected in other children of the same age group who do not have impairments). The child should be able to change activities or routines without distraction, and stay on task and in place when appropriate. The child should be able to sustain attention well enough to participate in group sports, read by himself/herself, and complete family chores. The child should also be able to complete a transition task (*e.g.*, be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).  The regulations provide that children in the 12 to 18 age group should be able to do the following:

> pay attention to increasingly longer presentations and discussions, maintain his/her concentration while reading textbooks, and independently plan and complete long-range academic projects. The child should be able to organize his/her materials and to plan his/her time in order to complete school tasks and assignments. In anticipation of entering the workplace, the child should be able to maintain attention on a task for extended periods of time, and not be unduly distracted by peers or unduly distracting to them in a school or work setting.

*Id.* § 416.926a(h)(2)(v).  Plaintiff argues that the December 2007 and March 2008 School Activity Reports identify deficiencies which do not explicitly refer to K.E.S.'s ability to attend and complete tasks, but that nonetheless prevent her from performing several of the activities listed in the relevant regulations.  (Plaintiff's Motion at 13-15).  She points out that the December 2007 report noted that, although K.E.S. was enrolled in the fifth grade, she was being instructed at a fourth grade level, and that her reading skills were at a third or fourth grade level.  (*Id.* at 13; Tr. at 98).  Plaintiff also notes that Dennis rated K.E.S.'s ability to comprehend classroom discussions, to remember information just heard, and to retain instruction from week to week as "below average."  (Plaintiff's Motion at 13).  She remarks further that Cashiola and Kane's findings in the March 2008 report are similar to Dennis's conclusions.  (*Id.* at 14-15; Tr. at 110).  Plaintiff argues that this evidence proves that K.E.S. is unable to perform activities expected of her age group.  (Plaintiff's Motion at 16; Tr. at

22

114-18).

Plaintiff fails to recognize, however, that the activities listed in the SSA regulations are not requirements, but mere examples.  *See* 20 C.F.R. § 416.926a.  Indeed, the regulations expressly caution against treating them as requirements:

> The examples are not all-inclusive, and we will not require our adjudicators to develop evidence about each specific example. When you have limitations in a given activity or activities in the examples, we may or may not decide that you have a "marked" or "extreme" limitation in the domain.

*See id*. § 416.926a(f)(3).  The regulations also provide that, "[W]e recognize that limitations of any of the activities in the examples do not necessarily mean that a child has a 'marked' or 'extreme' limitation."  *Id*. § 416.926a(b)(1).  The regulations acknowledge that "there is a range of development and functioning, and that not all children within an age category are expected to be able to do all of the activities in the examples of typical functioning."  *Id*.  So, while, in this case, Vallian's beliefs about her daughter's limitations have some evidentiary support, the ALJ is not required to find that she has a "marked" limitation if substantial evidence supports a different conclusion.  *See Boyd*, 239 F.3d at 704 (stating that a finding of "no substantial evidence" is proper only when "there are no credible evidentiary choices or medical findings that support the Commissioner's decision").  Here, the same records that Plaintiff references to support her claim also contain substantial evidence which supports the ALJ's determination that K.E.S. has a "less than marked" limitation in her ability to attend and complete tasks.  A reviewing court may not reweigh the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  Instead, so long as the record contains substantial evidence that supports the ALJ's decision, the court should uphold that decision.  *See id*.

### Formal Testing

Plaintiff also claims that the decision to deny her benefits cannot be upheld because the ALJ failed to properly evaluate the formal tests in regard to the domain of "attending and completing tasks." (Plaintiff's Motion at 19-27). She contends that the ALJ failed to evaluate K.E.S.'s test results for the WJC-III, WJA-III, and C-TONI, and that such failure amounts to a breach of the ALJ's duty to fully develop the record. (*Id.*). In particular, Plaintiff argues that the ALJ should have developed the record with "standard deviation information." (*Id.* at 25-26). In response to this argument, the Commissioner points out that the ALJ relied on the expert evaluation by Dr. Ferguson, the SSA doctor responsible for reconsidering Plaintiff's benefits application, and that Dr. Ferguson, in turn, relied on the standardized test findings. (Defendant's Response at 4-5). The Commissioner stresses that Dr. Ferguson qualifies as an expert, and that he found that K.E.S. had a "less than marked" limitation in the domain of "attending and completing tasks." (*Id.* at 5; Tr. at 294-95). Defendant argues that, because Dr. Ferguson reviewed all of the evidence in K.E.S.'s record in making a determination, the child's formal test scores were properly evaluated in regard to "attending and completing tasks." (Defendant's Response at 5).

It is true that, in determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Charter*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler,* 731 F.2d 1216, 1219 (5th Cir. 1984)); *accord Newton*, 209 F.3d at 458. For example, additional examinations "may be ordered when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on a claim." 20 C.F.R. § 404.919(a); *see Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (quoting *McGee v. Weinberger*, 518 F.2d 330, 332 (5th Cir. 1975)).

If the ALJ fails to develop the record, his decision is not supported by substantial evidence, and is subject to reversal if the error results in prejudice to the claimant.  *See Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557.  In addition, an ALJ must offer some explanation of the evidence to support his decision such that a reviewing court can determine whether the decision is based on substantial evidence.  *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).  However, the ALJ does not have to provide "an exhaustive point-by-point discussion."  *Id*.

In his decision, the ALJ here referred several times to the 2005 IIE performed by the DSE, during which the WJC-III, WJA-III, and C-TONI tests were administered. (Tr. at 32, 33, 35, 36). The ALJ discussed K.E.S.'s scores on these tests in concluding that she did not meet or medically equal the criteria for a listing.  (Tr. at 32).  He also discussed the IIE in relation to K.E.S.'s functioning.  (Tr. at 33).  In fact, he stated that,

> The claimant was thereafter assessed for special education toward the end of the 2004-5 year. However, the record evidence does not indicate "marked impairment" in any domain other than her ability to perform at an age-appropriate level where oral and written language are concerned. Instead, the initial evaluation for special education services, although confirmed the claimant's known problems, as she was 9 years old in the 2nd grade, also revealed a child who had a history of being cooperative, who adapted well to new situations, who made and kept friends quite well, and was able to complete tasks on time.

(*Id*.).  In addition, the ALJ cited K.E.S.'s scores in relation to her functioning in the domain of "acquiring and using information." (Tr. at 35).  Under the sub-section for "attending and completing tasks," he stated, "The claimant's June 2005 Individual and Initial Evaluation did not describe any difficulties in this area." (Tr. at 36).  Plaintiff argues that the ALJ's failure to identify specific "sub-test scores" is indicia that the ALJ did not fully evaluate K.E.S.'s formal testing on the domain of "attending and completing tasks." (Plaintiff's Motion at 19-22).  However, in her motion, Plaintiff points out that the tests were, "meticulously scored and interpreted." (*Id*. at 17).  The IIE, to which

the ALJ refers specifically, includes both K.E.S.'s formal test scores and the interpretations by Kathy Lucas, the educational diagnostician who administered the tests. In the IIE report, Lucas offers several opinions based on K.E.S.'s test scores that expressly concern the domain of "attending and completing tasks." Some of these findings are set out below:

> During tasks, K.E.S. had difficulty recalling story details of increasing length and complexity. (Tr. at 170).

> During tasks, K.E.S. has difficulty following directions of increasing length and complexity. She was typically able to follow 2 or 3 step directions. (*Id.*).

> Her Relative Proficiency Index score suggests that on a task of Basic Reading Skills, K.E.S. would be only 3% successful while her same aged peers would be 90% successful. On tasks of Reading Comprehension, K.E.S. is predicted to be 18% successful while her same aged peers are 90% successful. (Tr. at 176).

> Her Relative Proficiency Index scores suggest that she could be 71% successful on a Writing Sample task that her same aged peers were 90% successful. (Tr. at 177).

> Her Relative Proficiency Index suggests that she can be as successful as her same aged peers on math tasks. (*Id.*).

> K.E.S.'s disability/condition does not appear to affect her ability to perform in general Career and Technology Education programs. (*Id.*).

As Plaintiff recognized in her motion, Lucas "meticulously" interpreted K.E.S.'s formal test scores to reach these conclusions. (*See* Plaintiff's Motion at 17). Those scores show that K.E.S. struggles with reading and those tasks that involve more than three steps. But these scores also reveal that she is able to complete writing and math tasks. In addition, the results indicate that her impairment does not limit her in participating in career programs. The SSA regulations provide that "[t]he interpretation of the test is primarily the responsibility of the psychologist or other professional who administered the test." 20 C.F.R. § 416.926a(e)(4)(iii). Plaintiff has not challenged Lucas's qualifications to evaluate the formal test results or to render expert opinions.

Instead, Plaintiff claims that the significance of formal testing cannot be properly evaluated unless the ALJ develops "standard deviation information" for all sub-tests that could potentially impact the claimant's ability to attend and complete tasks.  (Plaintiff's Motion at 23-26).  In so arguing, Plaintiff points to a Florida district court case, *Fontanez v. Barnhart*, 195 F. Supp. 2d 1333 (M.D. Fla. 2002), as authority for her contention that the record must contain standard deviation information.  (*Id.* at 26).  However, the Florida court's finding in *Fontanez* was based solely on its own interpretation of the SSA regulations.  *See Fontanez*, 195 F. Supp. 2d at 1348.  In that case, the court held that, "[a]bsent standardized tests that measure functional abilities in terms of standard deviation information, a judge cannot usually determine the presence or absence of an 'extreme' or 'marked' limitation." *Id*.  Although the court in *Fontanez* concluded that the ALJ did not determine the significance of the claimant's low test scores, it did not explain whether the formal tests had been evaluated or interpreted.  *Id*.  Here, Plaintiff does not explain why Lucas's findings in the IIE are insufficient to show the significance of K.E.S.'s test scores.  In fact, in the IIE report, Lucas specifically commented on K.E.S.'s ability to perform reading, writing, and math tasks, as shown by her test scores.  (Tr. at 176, 177).  Plaintiff's argument does not compel this court to hold that an ALJ cannot rely on an expert's evaluation of formal test results in order to make a determination about a child's functioning.  The real issue is whether the ALJ has sufficient facts before him to allow him to make an informed decision.  *See Brock*, 84 F.3d at 728; *Kane,* 731 F.2d at 1219.  In this case, the ALJ did not neglect his duty, because the evidence as a whole, including Lucas's opinions, provided sufficient facts upon which to make an informed decision.  *Brock*, 84 F.3d at 728.  K.E.S.'s School Activity Reports and the Function Report offer extensive information about her ability to perform tasks at school and at home.  (Tr. at 99, 100, 114-18).  In addition, Lucas's findings in the

27

IIE report sufficiently detail how K.E.S.'s learning disability impacts her ability to perform tasks as compared to other children her age.  (Tr. at 170-77).  Based on this information, the ALJ adequately inquired into the extent of K.E.S.'s limitation, and then reached an informed decision. *See Brock*, 84 F.3d at 728.

As a final matter, Plaintiff argues that the regulations allow only two methods to determine the severity of a child's functioning:  (i) "standardized tests"; and (ii) "other medical findings." (Plaintiff's Motion at 25-26).  She claims that the ALJ may not take other factors into account, such as the child's own level of functioning, or academic progress reports.  (*See id*.).  The provision of the regulations to which Plaintiff refers states, as follows:

> In most functional areas, there are two alternative methods of documenting the required level of severity: (1) Use of standardized tests alone, where appropriate test instruments are available, and (2) use of other medical findings.

20 C.F.R. Part 404, Subpt. P, App. 1, 112.00(C).  Plaintiff offers no medical or expert evidence which shows that standardized tests in general, or the WJC-III, WJA-III, and C-TONI in particular, are the exclusive measures of a child's functioning in the domain of "attending and completing tasks."  Indeed, excluding school records beyond standardized test scores would not be consistent with other regulations.  In particular, the regulations require that all information about a child's functioning be taken into account:

> When we decide whether you have a "marked" or an "extreme" limitation....We will consider all relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you.

*Id*. § 416.926a(e)(1)(i).  Indeed, Plaintiff overstates the significance of "standard deviation information" in the ALJ's overall determination.  The regulations allow an ALJ to determine that

"standard deviation information," even if it is available, does not provide an accurate indication of a child's functioning in a given domain.  *See id*. § 416.926a(e)(4)(ii)(A)-(B).  In fact, they allow an ALJ to base his decision solely on information about the child's day-to-day functioning.  *Id*.  The regulations state,

> We may find that you have a "marked" or "extreme" limitation when you have a test score that is slightly higher than the level provided in paragraph (e)(2) or (e)(3) of this section, if other information in your case record shows that your functioning in day-to-day activities is seriously or very seriously limited because of your impairment(s).

> On the other hand, we may find that you do not have a "marked" or "extreme" limitation, even if your test scores are at a level provided in paragraph (e)(2) or (e)(3) of this section, if other information in your case record shows that your functioning in day-to-day activities is not seriously or very seriously limited by your impairment(s).

*Id*.  In this case, K.E.S.'s formal test scores were included in an evaluation report which contained interpretations of the test results.  (Tr. at 170-77).  The record also includes several reports from K.E.S.'s mother and teachers that document the child's day-to-day functioning in the domain of "attending and completing tasks."  (Tr. at 99, 100, 114-18).  Because this information was in the record, the ALJ could properly evaluate K.E.S.'s functioning, as required under the SSA regulations.  For that reason, the court is satisfied that the ALJ fulfilled his duties in making his decision.

In sum, the ALJ sufficiently developed the record to include all of the relevant evidence needed to make a informed determination.  Based on a review of that record, the ALJ's decision that K.E.S. is not disabled is supported by substantial evidence, and was rendered in accordance with the law governing her claim.  As a result, the decision need not be disturbed.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452.  For these reasons, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

29

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**, and that Plaintiff's motion for summary judgment be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 25th day of July, 2011.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**